**UNITED STATES COURT OF APPEALS**
**FOR THE TENTH CIRCUIT**

| | |
|---|---|
| HETRONIC GERMANY GmbH<br>HYDRONIC-STEUERSYSTEME GmbH,<br>ABI HOLDING GmbH,<br>ABITRON GERMANY GmbH,<br>ABITRON AUSTRIA GmbH, and<br>ALBERT FUCHS,<br><br>Appellants-Defendants,<br><br>v. | Case No. 20-6057<br>Case No. 20-6100<br><br>Appellants' Brief in Chief<br><br><u>ORAL ARGUMENT IS REQUESTED</u> |
| HETRONIC INTERNATIONAL, INC.<br><br>Appellee-Plaintiff. | IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA<br>Case No. 5:14-cv-650-F<br>(Honorable Stephen P. Friot) |

<u>**APPELLANTS' BRIEF IN CHIEF**</u>

**2. Table of Contents**


**4. Jurisdictional Statement 1**

**A. The basis of the District Court's subject matter jurisdiction 1**

**B. Court of Appeals jurisdiction pursuant to 28. U.S.C. Sec 1292(a) 2**

**C. Timeliness of Appeal 3**

**D. Appeal is from a final order 3**

**5. Statement of the issues presented for review 3**

**6. Statement of the case below 5**

**Summary of the Argument 23**

**Argument and Authorities 26**

**Argument 1: The District Court erred by granting a world-wide Injunction Under the Lanham Act against foreign citizen defendants' sales in foreign Countries to foreign citizen customer. 26**

**A. Trademark and trade dress rights are fundamentally geographical. 27**
**B. Trademark law does not travel beyond a country's borders subject to Limited exceptions. 29**
**C. The worldwide injunction cannot be entered because it is trying to reach Sales that have no substantial effect on U.S. Commerce. 31**
**D. The worldwide injunction lacks specificity required by FRCP 5. 32**

**Argument 2: The award of $90,133,496 of Lanham Act damages in unsupported. 34**

**Argument 3: The trial court erred by sustaining the relevance and unfair prejudice Objection, barring defendants from proving Their defense that their sales Activities in Europe had no substantial effect on U.S. Commerce. 40**

**Argument 4: The District Court erroneously ruled on the eve of trial that as a Matter of law plaintiff, not defendant, owned the Trademarks and trade Dress. 45**

**Argument 5: Notwithstanding the District Court's decision on ownership, it erred when it ruled that defendants could not present Their ownership**

**evidence for a different purpose.** **46**

**Argument 6: The District Court erroneously excluded defendants' Expert for Failing to conduct an audit.** **48**

**Argument 7: The District Court erroneously exercised personal Jurisdiction Over 4 defendants.** **51**

**Relief Sought** **54**

**Certifications** **55**

Attachments:

Attachment 1: Memorandum Opinion and Order (Abitron Germany And Abitron Austria) Filed 09/22/2015

Attachment 2: Memorandum Opinion and Order (ABI Holding GmbH And Albert Fuchs) Filed 11/06/2015

Attachment 3: Order (Granting in part & Denying in part Defendants' Motion for Partial Summary Judgment) Filed 03/22/2019

Attachment 4: Courtroom Minute Sheet (Motion Hearing) Filed 02/06/2020

Attachment 5: Courtroom Minute Sheet (Motion Hearing) Filed 02/10/2020

Attachment 6: Transcript Hearing on February 10, 2020. Dated 02/10/2020

Attachment 7: Permanent Injunction Order Filed 04/22/2020

Attachment 8: Final Judgment Filed 05/29/2020

# Table of Authorities

**Cases**

*Alcar Group v. Corporate Performance Systems, Ltd*, 109 F.Supp.2d 948, 949 (N.D. Ill. 2000)……………………………………………………………40

*Am. Greetings Corp. v. Dan-Dee Imports, Inc*., 807 F.2d 1136, 1147 (3d Cir. 1986)…………………………………………………………………….....33

*American Rice, Inc. v. Arkansas Rice Growers Cooperative Association*, 701 F.2d 408, 414-15 (5th Cir. 1983)………………………………………………….38, 39

*Archangel Diamond Corp. Liquidating Tr. v. OAO Lukoil,* 75 F. Supp. 3d 1343, 1364 (D. Colo. 2014)…………………………………………………………...53

*Archangel Diamond Corp. Liquidating Tr. v. Lukoil*, 812 F.3d 799 (10th Cir. 2016)…………………………………………………………………….....53

*Atlantic Richfield Company v. ARCO Globus International Company*, 150 F.3d 189, 193 (2nd Cir. 1990)……………………………………………………...34

*B & B Hardware, supra*, at ___ 135 S.Ct., at 1299…………………………..…27

*Blisscraft of Hollywood v. United Plastics Co.*, 294 F.2d 694 (2nd Cir. 1972)…….28

*Coletti v. Cudd Pressure Control,* 165 F.3d 767, 773 (10th Cir. 1999)………….40

*Commodores Entertainment Corporation v. McClary*, 879 F.3d 1114, 1131 (11th Cir. 2018). ……………………………………………………………..…29

*Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579, 592, 113 S. Ct. 2786, 2796, 125 L. Ed. 2d 469 (1993)…………………………………………………….49

*Emergency One, Inc. v. Am Fire Eagle Engine Co.*, 332 F.3d 267 (4th Cir. 2003)………………………………………………………………………28

*Gouskos v. Griffith,* 122 F. App'x 965, 967 (10th Cir. 2005)………………………………………………………………………46

*Green Tree Servicing, LLC v. Fisher*, 162 P.3d 944, 946 (Okla.Ct.App. 2007)……………………………………………………………………52

*Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995)………………27, 34, 40

*John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 984–85 (11th Cir. 1983)……………………………………………………………………33

*Knight v. Mooring Capital Fund, LLC*, 749 F.3d 1180, 1186 (10th Cir. 2014)…..46

*Lawlis v. Moore Iron & Steel Corp.,* No. CIV-13-823-D, 2016 WL 112618 (W.D. Okla. Jan. 11, 2016)……………………………………………………50

*Lockwood Corp. v. Black*, 501 F.Supp. 261, 263-64 (N.D.Tex. 1980),…………..52

*Marcus Food Co. v. DiPanfilo*, 671 F.3d 1159, 1166 (10th Cir. 2011)…………..51

*Matal v. Tam*, 137 S.Ct. 1744, 1751; 198 L.Ed. 366 , 137 (2017)…………....27, 29

*McBee v. Delica Co., Ltd*, 417 F.3d 107, 111, 126 (1st Cir. 2005).34, 35, 37, 38, 39

*Mobilificio San Giacomo S.P.A v. Stoffi*, No. C.A. 96-415-SLR, 1998 WL 125534, at 9 (D.Del. Jan. 29, 1998) ……………………………………………..…52

*Neil Bros. Ltd. v. World Wide Lines*, Inc., 425 F.Supp.2d 325, 328 (E.D.N.Y.2006)…………………………………………………………...52

*Nutramax Labs., Inc. v. Manna Pro Prod., LLC*, No. 0:16-CV-01255-JMC, 2017 WL 3276284(D.S.C. Aug. 2, 2017)……………………………………………51

*Ocean Garden, Inc. v. Marktrade Co.,* 953 F.2d 500, 504 (9th Cir.1991)………..38

*Person's Co., Ltd. v. Christman,* 900 F.2d 1565, 1569, 1571-72 (Fed. Cir. 1990)……………………………………………………………………30

*Pinkberry v. JEC International Corp.* 2011 WL 610828 (C.D. Ca. Dec. 7, 2011)…31

*Radil v. Sanborn Western Camps, Inc.* 384 F.2d 1220 (10th Cir. 2004)……32

*Schreiber v. Dunabin*, 938 F.Supp.2d 587, 598 (E.D. Va. 2013)…………………28, 30

*Star-Kist Foods, Inc. v. P.J. Rhodes & Co.*, 769 F.3d 1393, 1396 (9th Cir. 1985)..31

*Steele v. Bulova Watch Company,* 344 U.S. 280 (1952)……………………Passim

*Sterling Drug, Incorporated v. Bayer AG*, 13 F.3d 733, 746 (2nd Cir. 1994)……………………………………………………………………….……31

*Supre v. Ricketts,* 792 F.2d 958, 961 (10th Cir. 1986)…………………………49

*Sw. Stainless, LP v. Sappington,* 582 F.3d 1176 (10th Cir. 2009)………………32
*Star-Kist Foods, Inc. v. P.J. Rhodes & Co., 769 F.3d 1393, 1396 (9th Cir. 1985)*

*Tire Engineering and Distribution LLC v. Shandong Linglong Rubber Company Ltd*, 682 F.3d 292, 310-11 (4th Cir. 2012)……………………………………37, 38

*United States v. Nacchio*, 519 F.3d 1140, 1155–56 (10th Cir. 2008) ………………………………………………………………………….....49, 50

*Vanity Fair, Inc. v. T. Eaton Co.,* 234 F.2d 633, 639, 643 (2nd Cir. 1956)………35, 36, 37

*Wells Fargo & Co. v. Wells Fargo Express, Co.*. 556 F.2d 406 (9th Cir. 1977)…37

**U.S. Constitution**

Seventh Amendment

**Statutory Authority**

28 U.S.C. Sec. 1292(a)(1)……………………………………………………………...…1, 2, 3
12 U.S.C. Sec. 1291……………………………………………………………….….....1, 3
Lanham Act 15 U.S.C. Sec. 1051 et seq………………………………..1, 28
28 U.S.C. Sec. 1331……………………………………………………………1
28 U.S.C. Sec. 1332 (a)(2)……………………………………………...…1
28 U.S.C.App., p. 755…………………………………………………………………………49

**Foreign Authority**:

a. **Regulations**:

i. EUIPO Guidelines (Version 1.0 January 2020), Provision 5: Res Judicata……………………………………………………15

ii. EUIPO Guidelines (Version 1.0 of 1 February 2020), Part E: Register operations, Section 3: EUTMs and RCDs as objects of property, Chapter 1: Transfer, Provision 3.5 Proof of transfer

b. ***Administrative Cases***.

i. *Lichtwer Pharma v. OHIM—Biofarma* (Sedonium), Order of the Court of First Instance (Second Chamber) July 3, 2003

ii. *see also*, *OHIM, Decision of the Fifth Board of Appeal,* In Case R 785/2019-5……………………………………………17

iii. *OHIM, Decision of the Second* Board of Appeal, In Case R 1888/2007-
2……………………………………………………………17

**Federal Rules**

Rule 4(a)(1)(A), Fed. R. App. P……………………………………………..3
FRCP 4(k)(2)………………………………………………………………..53
Fed. R. App. P. 8(a)(2)
10th Cir. R. 8.1
FRCP 44.1………………………………………………………………..4
FRCP 65…………………………………………………………4, 24, 33

FRE 105…………………………………………………………………..46
FRE 602…………………………………………………………………..49
FRE 701…………………………………………………………………..49
FRE 702…………………………………………………………………..49
FRE 703…………………………………………………………………..49

**Treatises**

J. Thomas McCarthy, *McCarthy on Trademarks*, § 19:1.25 (5th ed. 2017) …………28, 29
2 J.T. McCarthy, *supra,* § 30.8, at 334)…………..33

**List of Prior or Related Appeals Pursuant to 10th Cir. R. 28.2(C)(3)**: There are no prior or related appeals. Appeal Nos. 20-6057 & 20-6100 were consolidated by Order of this Court dated 07/10/20.

## 4. Jurisdictional Statement

There are two consolidated appeals in this case: (1) the appeal of an Injunction order under 28, U.S.C. Sec. 1292(a)(1); that is Case no. 20-6057, and (2) an appeal of the final judgement in the same case under 12 U.S.C. Sec. 1291; that is Case no. 20-6100.

### A. The basis of the District Court's subject matter jurisdiction.

The appellee/plaintiff-below asserted 13 counts. Six counts arose under the Lanham Act 15 U.S.C. Sec. 1051 et seq. (Aplt. App. Vol. 3, 718); the basis of jurisdiction for those counts is Federal Question under 28 U.S.C. Sec. 1331. For the remaining 7 counts, subject matter jurisdiction arose under diversity of citizenship and amount in controversy, 28 U.S.C. Sec. 1332(a)(2). (Aplt. App. Vol. 3, 671-739). There was complete diversity between the plaintiff-below, Hetronic International, Inc. a Delaware corporation with its principal place of business in Oklahoma City, Oklahoma, and the defendants, all of whom are all citizens of foreign countries. With regard to the amount in controversy, plaintiff sought in excess of $75,000, exclusive of interest and costs on each of the 7 state-law claims.

Subject matter extraterritorial jurisdiction is a key issue on appeal. 5 defendants had <u>no</u> sales to U.S. customers, but the District Court purported to have extraterritorial jurisdiction under the Lanham Act to permanently enjoin their future

sales in all the other countries of the world, and to award $29,583,146 of Lanham Act damages against these defendants based on $29,583,146 of foreign sales.

With regard to the remaining defendant (Abitron Germany GmbH), the proof at trial was that it had $16,670 of sales to U.S. customers, comprising 0.0002% of its total sales. Based on those $16,670 of sales, the District Court purported to have extraterritorial jurisdiction under the Lanham Act to award damages on the other 99.98% of their sales made in foreign countries to foreign citizen buyers. The District Court also permanently enjoined all of Abitron Germany GmbH's future foreign sales in all the other countries of the world.

Defendants respectfully state that no such extraterritorial jurisdiction exists under the Lanham Act.

**B. Court of Appeals jurisdiction pursuant to 28 U.S.C. Sec. 1292(a)**

This is an appeal from the permanent Injunction entered below on April 22, 2020. (Aplt. App. Vol 10 p. 2514). Pursuant to 28 U.S.C. Sec. 1292(a)(1), this Court has jurisdiction over an interlocutory order granting injunction. This is also an appeal from the final judgment entered below on May 29, 2020. (Aplt. Appl Vol. 10 p. 2535).

**C. Timeliness of appeal.**

In Case No. 20-6057, the permanent Injunction was entered on April 22, 2020 (Aplt. App. Vol. 10 p. 2514). Two days later, on April 24, 2020,

appellant/defendants-below filed their Notice of Appeal (Dist. Ct. Dkt. Item 440). In Case No. 20-6100, the final judgment was entered on May 29, 2020 (Aplt. Appl Vol. 10 p. 2535) and this appeal was taken on June 25, 2020. Thus, both appeals were taken within 30 days and are timely under Rule 4(a)(1)(A), Fed. R. App. P.

**D. Appeal is from a final order.**

This is an appeal from a Permanent Injunction Order entered on April 22, 2020 (Aplt. App. Vol. 10, p 2514). Pursuant to 28 U.S.C. Sec. 1292(a)(1), this is an immediately appealable final order. This is also an appeal from the final judgment entered on May 29, 2020 (Aplt. App. Vol. 10, 2535). Pursuant to 28 U.S.C. Sec. 1291, this is a final order. Lastly, this is an appeal of two orders denying defendants' motions to dismiss for lack of personal jurisdiction (Aplt. App. Vol. 1, p119, p. 141). Pursuant to 28 U.S.C. Sec. 1291 these are final orders.

**5. Statement of the issues presented for review.**

1. The District Court erred in entering a worldwide Lanham Act injunction and $29,583,146[1] in Lanham Act damages against the 5 foreign citizen defendants who had no sales to U.S. customers. These 5 foreign defendants only had sales in foreign countries to foreign customers.

[1] $29,583,146 is the sum of the Lanham Act awards against Hydronic Steuersysteme, Hetronic Germany, Abitron Austria, ABI Holding, and Albert Fuchs ($8,366,305 + $2,788,037 + $859,904 + $2,608,048 +$703,701 + $51,888 + $14,205,263 = $29,583,146).

2. The District Court erred in entering a worldwide Lanham Act injunction and $60,543,676[2] in Lanham Act damages against the defendant (Abitron Germany) with only *de minimus* sales to U.S. customers ($16,670 or 0.0002% of its sales). Abitron Germany's remaining sales took place in foreign countries and were made to foreign citizen customers. The District Court further erred in entering a worldwide injunction that lacks the specificity required by FRCP 65. For example, the worldwide injunction references certain "trade dress" but does not adequately describe the trade dress.

3. The District Court erred by sustaining a "relevance" and "unfair prejudice" objection, the effect of which was to bar defendants from presenting their defense that the foreign sales activities had no effect on U.S. commerce.

4. The District Court erred in granting issue preclusion based on *dicta* in a non-final European administrative order. The District Court compounded that error in going beyond that *dicta* to apply it to product names and trade dress that were not at issue or mentioned in the European administrative order. The District Court erred by then applying the *dicta* to 5 defendants who were not parties to the European administrative proceeding. The District Court erred as a matter of law in determining foreign law pursuant to FRCP 44.1. Relatedly, the District Court erred

[2] The total Lanham Act damages awarded against Abitron Germany were $60,560,346; when the U.S. sales ($16,670) are deducted, the $60,543,676 of foreign sales remain ($60,560,346 - $16,670 = $60,543,676).

as a matter of law in relying on the European Order to establish ownership in plaintiff when the European body did not have the jurisdiction to resolve ownership in the first instance.

5. The District Court erred when it ruled that defendants, by pleading "ownership of the trade names and trade dress" as a defense to infringement, had not preserved the defense of "belief in ownership."

6. The District Court erred in excluding the testimony of defendants' accounting expert because he had not performed an *audit* of defendants' books and records, but merely opined based on books and records of the Defendants – the same books and records upon which plaintiff's accounting expert based his opinions.

7. The District Court erred in exercising personal jurisdiction over foreign defendants Albert Fuchs, ABI Holding, GmbH, Abitron Austria, none of whom had minimum contacts with the State of Oklahoma or the United States. The District Court erred in exercising personal jurisdiction over Abitron Germany which had no minimum contacts with Oklahoma. Abitron Germany had *de minimus* sales ($16,670) in the United States, but outside Oklahoma.

## 6. Statement of the Case below.

**The Lanham Act Injunction and the $90,133,496 Lanham Act of damage awards reach purely foreign sales. Five defendants had zero U.S. sales, and the remaining defendant had $16,670 of U.S. sales.**

This case arises out of an invention created by a German company called Hetronic Steuersysteme, GmbH. (Aplt. App. Vol. 13, p 3090). The idea was to take a Radio Remote Control ("RRC") and put it into a construction crane, so that the crane operator did not have to sit in the "cab" of the crane, but could stand on the ground, at a distance away from the crane and the work, and operate the crane by remote control.

Plaintiff Hetronic International, Inc. is the owner of the "Hetronic" name. In 2006, Hetronic International licensed the rights to sell "Hetronic" named products to Hydronic Steuersysteme (an Austrian defendant), and in 2010, Hetronic International granted the rights to the "Hetronic" name to Hetronic Germany (a German defendant). (Aplt. App. Vol. 13, p 3062, p 3071).

However, during the years 2011 and 2012, these two defendants discovered that ownership of the product names (the "NOVA" product name, and well as the ERGO," the "EURO," the "FE," the "GL," the "GR," the "TG," the "HH," the "Pocket," and the "RX" products), and those products' trade dress, was in defendant Hetronic Germany, not in plaintiff Hetronic International. (This ownership trail will be detailed below).

As a result, a dispute arose between plaintiff Hetronic International and defendants Hetronic Germany and Hydronic Steuersysteme. This culminated in June 2014, when Hetronic International terminated the licensing agreements

regarding the "Hetronic" name with both companies (defendant Hetronic Germany and Hydronic Steuersysteme). (Aplt. App. Vol. 13, p. 3081, p. 3083).

Thereafter the defendants began steps to cease use of the "Hetronic" name. But they did not concede ownership of the product trade names (the "NOVA," the ERGO," the "EURO," the "FE," the "GL," the "GR," the "TG," the "HH," and the "RX"); instead, they continued to maintain that the chain of ownership of the product names led directly from Hetronic Steuersysteme (the original creator) to Hetronic Germany, not to Hetronic International. Two new companies were formed, defendants Abitron Austria GmbH and Abitron Germany GmbH, and they abandoned use of the "Hetronic" name, but acquired rights from Hetronic Germany to the continued use of the products (the "Nova," the ERGO," the "EURO," the "FE," the "GL," the "GR," the "TG," the "HH," and the "RX"). (Aplt. App. Vol. 11, p. 2568).

A few weeks later, in June 2014, plaintiff Hetronic International filed this suit against its two former licensees (now terminated):

Hydronic Steuersysteme GmbH (the Austrian company)

Hetronic Germany GmbH (the Germany company)

And eventually enlarged the suit to include as defendants the two newly formed companies, Abitron Austria and Abitron Germany (which did not use the "Hetronic"

name, but which continued to use the product names that they believed they owned ("NOVA," "Ergo," etc.).

Hetronic International also expanded the suit to include the holding company, ABI Holding, GmbH (which owned Abitron Austria and Abitron Germany) and its owner, Mr. Albert Fuchs. Those are the six defendants:

(1 and 2): Hydronic Steuersysteme (Austria) and Hetronic Germany, the original "Hetronic" licensees,

(3 and 4): Abitron Austria and Abitron Germany, the two newly formed companies, who did not use the "Hetronic" name, but who purchased rights to use the product names ("NOVA," "Ergo," etc.) and continued using them,

(5 and 6): ABI Holdings, and Mr. Albert Fuchs.

Except for *de minimus* sales ($16,670) (Aplt. App. Vol. 13, p. 3288-89, Vol. 12, p. 3004-3020, 3027), all of the defendants' sales which the District Court enjoined, and on which the District Court allowed plaintiff to recover $90,133,946 in damages, are non-U.S. sales. These were sales made in foreign countries, by a foreign-citizen defendant to a non-U.S. foreign-citizen customer. (Aplt. App. Vol. 12, p. 3004-20).

The District Court entered Judgment (Aplt. App. Vol. 10, p 2535) for the following Lanham Act damage awards against these defendants in these amounts:

| Defendant | Lanham Act Damages Awarded | U.S. sales (sales into the U.S. or sales made overseas but to a U.S. customer) |
|---|---|---|
| Hydronic Steuersysteme | $2,608,048<br>$703,701<br>$51,888<br>$3,363,637 | $0.00 |
| Hetronic Germany | $8,366,305<br>$2,788,037<br>$859,904<br>$12,004,246 | $0.00 |
| Abitron Austria | $14,205,267 | $0.00 |
| Abitron Germany | $60,560,346 | $16,670 |
| ABI Holding | $90,133,496 (jointly with all of the above) | $0.00 |
| Mr. Albert Fuchs | $90,133,496 (jointly with all of the above) | $0.00 |

There is no evidence in the trial record that any defendant had a sale in the U.S. (or a sale to a U.S. customer in a transaction taking place overseas) in approximately the past 4 years. (Aplt. App. Vol. 12, p. 3004-20). Nevertheless, the District Court also proceeded to enjoin all the foreign-citizen defendants' future "worldwide" sales, in foreign countries, to foreign-citizen buyers in all the countries of the world. (Aplt. App. Vol. 10, p. 2514).

**The District Court originally ruled that the "ownership" of the product names (the "NOVA," the "ERGO," the "EURO," etc.) and their trade dress was in factual dispute, but 6 days before trial reversed that ruling and forbade defendants from presenting their proof that they owned the trade names and trade dress.**

The product names at issue in this case are the "NOVA, the "ERGO," the "EURO," the "FE," the "GL," the "GR," the "TG," the "HH," and the "RX"). These product names, and their trade dress, were created by the German company Hetronic Steuersysteme GmbH before either the plaintiff company, or any of the defendant companies came into existence. (Aplt. App. Vol. 13, p. 3090). The "steuersysteme"

part of the name comes from the German-English cognate word, "steuer" or "steerer," and so a "steuersysteme" is a "steering system" or a Radio Remote Control.

During the early years of the company (the 1980's and 1990's), Hetronic Steuersysteme created 10 products, with 10 trade names:

The earliest drawings of these products show "Hetronic Steuersysteme" as the creator, they show the product name ("NOVA," "ERGO," etc.), and they show creation dates -- all preceding the year 2000. As one example, here is the NOVA drawing from the year 1995:



(Aplt. App. Vol. 11, p. 2556).

It shows the "NOVA" product name, the wiring, the distinctive "Figure 8" design, the 1995 date, and the "Hetronic Steuersysteme" name. Hetronic Steuersysteme, began selling these in 1995, as shown by the invoice:

HETRONIC
STEUERSYSTEME

HETRONIC-Steuersysteme GmbH · Adalbert-Stifter-Str. 2 · D-84085 Langquaid
Ad. A. Klein
Transporttechniek B. V.
z. H. Herrn Klein
Rijnkade 15

NL-1382 GS Weesp. Holland

Telefon: (0 94 52) 1 89-0
Telefax: (0 94 52) 1 89-20

USt-IdNr.: DE128584351

R E C H N U N G Seite: 1

Kundennummer: 11582
Rechnungsnummer: 9511R5112
Rechnungsdatum: 09.11.95
Referenz: 9511L9199

11020 / 8126

Lieferung: Woche 44/45 ab Hetronic
Bestellung Nr. 83464 vom 18. Oktober 1995.

| Artikel-Nr. | Beschreibung | Menge | Einh. | Einzel-Preis | Rabatt | Gesamtpreis |
|---|---|---|---|---|---|---|
| | Beleg 9511L9199 vom 07.11.95 | | | | | |
| | Beleg 9510A8173 vom 24.10.95 | | | | | |
| 80006094 | Funkfernsteuerung GA 609 NOVA | 1.00 | | 2200.00 | 40.00 % | 1320.00 |
| | Version II, mit 21 Relais | | | | | |
| | best. aus: 1 Sender mit Gurt, | | | | | |
| | 1 Akku | | | | | |
| | OHNE HF-TEIL! | | | | | |

(Aplt. App. Vol. 11, p 2557).

Similar drawings and invoices exist for the other 9 product names, showing the product names, a sketch of the design, a date preceding plaintiff's existence (pre-2000), and "Hetronic Steuersysteme as the creator. (Aplt. App. Vol. 11, p. 2558-59, and 2990-3003).

Hetronic Steuersysteme's creation of these products, their names and trade dress predates the corporate existence of the plaintiff Hetronic International, Inc. in the year 2000. (Aplt. App. Vol. 11, p. 2560).

To resolve the identity of the owner of the product trade names (the "NOVA," the "ERGO," the "EURO," the "FE," the "GL," the "GR," the "TG," the "HH," and the "RX"), one must identity the successor-in-interest to Hetronic Steuersysteme. The answer is found in a series of three contracts.

**2000 Research & Development Agreement**

The R&D Agreement, the first of the three contracts was signed in the year 2000. (Aplt. App. Vol. 12, p. 2986). That was the year plaintiff's predecessor, Hetronic International, Inc. was formed, and during that year it signed a contract with Hetronic Steuersysteme acknowledging that Hetronic Steuersysteme, not Hetronic International, was the owner of the trade names and trade dress designs. The contract, recites:

"Contractor [plaintiff Hetronic International] acknowledges that the Developer [Hetronic Steuersysteme] **is, and shall remain, the sole owner** of all that which is done, produced or developed by the Contractor, including but not limited to the know-how, technical information, **designs, product descriptions, trade marks, trade names** . . . and acknowledges Developer's exclusive right, title and interest in and to such property."

(Aplt. App. Vol. 12, p. 2988).

**2008 Asset Purchase Agreement**

Then, the second contract arose in the year 2008; by this time, Hetronic Steuersysteme had been renamed Hetronic Deutschland GmbH. (Aplt. App. Vol. 18 p. 2613-2842 and Vol. 19 p. 2843-2985). In the 2008 contract, Methode Electronics purchased plaintiff's predecessor, Hetronic International, and was offered an opportunity at the time to purchase Hetronic Steuersysteme (by then, renamed Hetronic Deutschland), but explicitly refused to do so. Thus, in the 2008 Purchase Agreement, Methode Electronics purchased Hetronic International, but specifically *excluded* the purchase of the shares or assets of the "essential" business of Hetronic Deutschland:

> "provided, however, that Hetronic Deutschland's distribution and assembly operation is an essential component of the business conducted by the Target Companies, and none of such operations are being acquired because neither the shares or assets of Hetronic Deutschland are included in the Acquired Assets."

(Aplt. App. Vol.18 p. 2633).

Plaintiff's President, Mark Shermatero confirmed that Plaintiff's parent company did not buy Hetronic Deutschland's assets in this purchase. (Aplt. App. Vol. 15, p. 3914).

**2010 Asset Purchase Agreement**

Finally, in the third contract, in 2010, Hetronic Deutschland (f/k/a Hetronic Steuersysteme) sold all its assets to defendant Hetronic Germany. (Aplt. App. Vol. 11, p. 2561).

Below is a chart showing the trail of these 3 transactions:




In 2018, two years before trial, defendants moved for partial summary judgment on the "ownership" issue based on this evidence. (Aplt. App. Vol. 4, p. 924). In March 2019, approximately one year before trial began, the District Court denied the motion, ruling that facts regarding ownership were in dispute:

"The court remains convinced that genuine issues of material fact exist on the ownership issue."

(Aplt. App. Vol. 7, p. 1702, at p. 1726).

Approximately a year later, on February 6, 2020, six days before trial was to begin on February 11, 2020, the District Court reversed that ruling (Aplt. App. Vol. 8, p. 2153), and on the day before trial prohibited defendants from presenting their evidence of "ownership:"

"My ruling with respect to issue preclusion forecloses the presentation of evidence to rebut plaintiff's evidence that it is the owner of the trademarks, trade dress and technology."

(Aplt. App. Vol. 9, p. 2413).

The basis of the District Court's ruling was the application of "issue preclusion" to a non-final ruling in an administrative proceeding before European Union Intellectual Property Office (the "EUIPO").[3] [4] However, EUIPO did not have the ownership issue before it. It was not a challenge to "ownership," but rather whether plaintiff Hetronic International filed the "NOVA" trademark in the European Union in "bad faith". This is confirmed by the EUIPO Order:

> 2 The application of July 20, 2015 is based on the cancellation ground of bad faith on the part of the Applicant pursuant to Article 59(1) (b) EUTMR, and on Article 60(1) (c) EUTMR in conjunction with Article 8(4) EUTMR and section 4, no. 2 Trademark Act, based on the earlier non-registered trademark
>
> NOVA
>
> used in trade in Germany for the goods:
>
> "wireless remote control apparatus for regulating operations of motorized machines, cranes, and lifting gears".

---

[3] Defendants' appendix includes a separately identified section containing Foreign Law Materials. These foreign law materials may be found at (Aplt. App. Vol. 13, p. 3090-3200).

[4] The EUIPO Order is now on appeal to the European General Court (Case number T-75/20). (Aplt. App. Vol. 13, p 3117). The EUIPO action may be withdrawn prior to a decision of the European General Court at which point the EUIPO Order would have no further force and effect. EUIPO Guidelines (Version 1.0 January 2020), Provision 5: Res Judicata; (noting that the defense of res judicata is unavailable if a trademark cancellation application is withdrawn prior to a final decision) (Aplt. App. Vol. 13, p. 3118); *Lichtwer Pharma v. OHIM—Biofarma* (Sedonium), Order of the Court of First Instance (Second Chamber) July 3, 2003 (noting that withdrawal of trademark opposition action makes further proceedings "devoid of purpose."). (Aplt. App. Vol. 13, p. 3119, at 3123).

(Aplt. App. Vol. 13, p. 3107).

The EUIPO holding relevant to these proceedings was that the NOVA application was not made in "bad faith" because there was a contract "dispute" between these litigants:

> 33 The Plaintiff bases its allegation of bad faith on supposedly earlier rights in the mark "NOVA". As already pointed out (see margin no. 29), however, it has no rights to a "NOVA" trademark acquired by use. The objection that at the time the contested trademark was filed, the Trademark Owner knew that the Plaintiff had acquired rights to the "NOVA" mark as a result of many years of use is essentially wrong , because the issue of whether a mark has acquired market recognition within the meaning of section 4, no. 2 Trademark Act is a question of law that is not accessible to knowledge. In essence, the parties are in dispute about the scope of the company split and the interpretation of the various company purchase agreements, as well as other agreements. This dispute concerns contract law issues only and it cannot immediately constitute bad faith for a contract party to interpret a contract in its own favor.

(Aplt.App. Vol. 13, p 3114). Thus, the relevant question before EUIPO was whether plaintiff's trademark filing (on one product, the "NOVA") was made in bad faith. EUIPO's answer to this one question is simple: there can be no "bad faith" in applying for a trademark ("NOVA") where there is a contract dispute concerning ownership between the parties.[5]

In fact, EUIPO did not have the jurisdiction to establish ownership under European law. The EUIPO Guidelines state: "The Office does *not* consider or *rule on contractual or legal questions arising under national law.*" EUIPO Guidelines

---

[5]EUIPO also found an absence of "bad faith" based on defendants' failure to present sufficient evidence of a prior unregistered use of NOVA under *German* law. Importantly, this EUIPO finding did not establish ownership of NOVA in plaintiff; it was merely a factual predicate for EUIPO's no "bad faith" determination.

(Version 1.0 of 1 February 2020), Part E: Register operations, Section 3: EUTMs and RCDs as objects of property, Chapter 1: Transfer, Provision 3.5 Proof of transfer (emphasis supplied) (Aplt. App. Vol. 13, p. 3126); *see also*, *OHIM, Decision of the Second* Board of Appeal, In Case R 1888/2007-2 (noting that contractual and property issues are "beyond the Office's jurisdiction since they are matters governed by the national law and subject to the national jurisdiction pursuant to Article 16 CTMR"); *see also*, *OHIM, Decision of the Fifth Board of Appeal,* In Case R 785/2019-5 (noting that breach of contract issues are decided under national law, not by EUIPO). (Aplt. App. Vol. 13, p. 3164). Indeed, prior to the EUIPO Order upon with the District Court relied, there was a *prior* EUIPO cancellation proceeding. There, EUIPO, in its preliminary comments noted that the "Cancellation Division finds that the disputes, if any, between the parties under national (civil) or corporate law are not the subject matter of the proceedings." (Aplt. App. Vol. 13, p. 3179).

In simplest terms, EUIPO did not decide who owns the "NOVA" because it did not have the jurisdiction to do so.

Instead, EUIPO merely determined the fact of a "dispute" about who owns the NOVA, and under applicable European law, such a dispute cannot result in "bad faith." The situation is analogous to a bad faith insurance case, in which the court decides there has been no bad faith in the denial of an insurance claim, but will allow the case for breach of an insurance agreement on the merits to go forward. Thus,

Defendants did not receive a trial on ownership in any forum—not before EUIPO and not in the District Court. This denied defendants their fundamental right to a trial by jury under the 7th Amendment to the United States Constitution.

Nevertheless, the District Court relied on *dicta* regarding the "ownership" issue in Germany found within the EUIPO Order, and held that *dicta* precluded the claim of ownership of the "NOVA" name in the case below.

The District Court then expanded that "issue preclusion" decision. The District Court applied it to defendants who were not parties to the EUIPO administrative proceeding, and then the District Court decided to apply it to countries and product names (or their trade dress) whose ownership was not considered by the EUIPO body; the other 9 product names at issue in this lawsuit ("ERGO," "EURO," "GL," "GR," "TG," "HH," "MINI," "Pocket" and "RX") and their trade dress were not at issue in the EUIPO proceeding and so the EUIPO decision does not even mention their names, much less analyze who the legal owner is.[6]

[6] Moreover, the EUIPO website shows, as of todays' filing, that defendant Abitron Germany is the record *owner* of two of those trademarks, the "GR" and the "GL" in Germany *and* in the European Union. https://euipo.europa.eu/eSearch/#details/trademarks/018060130; https://euipo.europa.eu/eSearch/#details/trademarks/018060128.

The fact that EUIPO lacks jurisdiction to decide national law questions makes sense in the trademark context. Thus, ownership of a trade name is a fundamentally geographical issue, with ownership rights going to the first entity to use the name in commerce in a particular geographic region. With no evidence of what the other 9 trade names were, much less who was the first to use the name in any geographical region, it was not possible for the EUIPO to reach the issue. Clearly, it could not reach the issue for "all the countries of the world." These defendants sell in 42 countries around the world:

| | | | | |
|---|---|---|---|---|
| Austria | Denmark | Malaysia | Romania | Iceland |
| Australia | Finland | Netherlands | Egypt | Lithuania |
| Belgium | France | Norway | South Africa | Venezuela |
| Canada | United Kingdom | Philippines | Qatar | |
| Switzerland | Hong Kong | Portugal | United Arab Emir. | |
| Chile | Italy | Sweden | Russia | |
| China | South Korean | Hungary | Slovakia | |
| Germany | Luxembourg | Slovenia | Singapore | |
| Denmark | Malta | India | Georgia | |

(Aplt.App. Vol. 12, p. 3020-3023). Without deciding what entity owns the NOVA, EUIPO only considered the substantive unregistered trademark law of Germany; its decision does not mention the laws of the above countries. Nor does

the EUIPO order mention the facts of who was the first to use the product names in these other countries, and does not purport to resolve the "ownership" issue in any of those countries. But the District Court ruled as if the EUIPO board did just that. The District Court held that the EUIPO Order permanently decided ownership of all 9 products names (including the 8 not mentioned in the EUIPO decision) and their related trade dress for all the countries in the world.

Then, on February 10, 2020, the day before trial began, the District Court expanded that ruling. Not only were defendants prohibited from introducing any evidence of "ownership," but they were prevented from presenting proof of a reasonable belief in ownership as a defense to the "willfulness" component of the "willful infringement" claim. Thus, the District Court ruled on the day before trial began:

"The question of a good faith belief in ownership is not an issue that will be introduced into this case at this point for the reasons I have stated." (Aplt.App. Vol. 9, p2412.)

Upon prompting by plaintiff's counsel, the District Court even cautioned defense counsel from trying to inject ownership on the topic of intent:

"Mr. Thompson [opposing counsel]: Your Honor, if I may. What I just think I heard is that they going to back-door everything that just got excluded by Your Honor through the now view that, well since plaintiff's intent is relevant, we can still bring up the R & D agreement . . ."

The Court responded:

"The Court: Okay. Well, I'm relying in part on the fact that in the case – Mr. Steiner's [defense counsel's] previous case that he tried in front of me, he saw me

lock horns with his opposing counsel, who had a full head of steam. I don't think Mr. Steiner wants the same experience." (Aplt.App. Vol. 9, p. 2415-16).

Not surprisingly, at each juncture in the Verdict at which the Jury was asked if the infringement had been "willful," the jury checked "yes" against all defendants; here is one example:

**4. Has plaintiff proven by the greater weight of the evidence that the following defendant or defendants willfully or intentionally infringed the Product Marks? (Circle "Yes" or "No" as to each defendant)**

| | | |
|---|---|---|
| **Abitron Germany** | **Yes** (circled) | **No** |
| **Abitron Austria** | **Yes** (circled) | **No** |
| **ABI Holding** | **Yes** (circled) | **No** |
| **Albert Fuchs** | **Yes** (circled) | **No** |

Without the defense of ownership (or belief in ownership) defendants were left naked to defend against the tort claims (unfair competition, conspiracy, conversion, tortious interference, and aiding and abetting). The jury awarded plaintiff the prayer on the tort claims ($5,360,832.00), and without a "good faith" defense of ownership, the jury awarded double punitive damages on the tort claims ($10,721,664). (Aplt. App. Vol. 10, p. 2492).

Then, mid-trial the District Court took the damages defense away too. Under the Lanham Act, a plaintiff can claim the defendants' "revenues" (not net profits) as damages. It is up to the defendant to present the off-setting defense of "cost of goods sold," which, if believed by the jury, the jury is then instructed to subtract from the revenues.

Plaintiff's expert accountant testified during plaintiff's case that the defendants' total revenues on RRC sales was $90,133,496. Plaintiff's expert arrived at this total with two separate numbers: first, he totaled disgorgement of Lanham Act revenues ($89,231,699); second, he totaled reverse palming off revenues ($911,792)($89,231,699 + $911,792 = $90,133,496)(Aplt. App. Vol. 13, p. 3088-89). In doing so, plaintiff's expert relied on the books and records of the defendants. It then became incumbent on defendants' expert to present a relatively simple arithmetical totaling of the "cost of goods sold." But, defendants' expert did not get to testify. The District Court conducted a *voir dire*, out of the presence of the jury, and learned that, to total the "cost of goods sold" defendants' expert was relying on the same books and records of the defendant companies as was relied on a few days earlier by plaintiff's expert to total the revenues to arrive at the $90,133,496 claim. But during *voir dire*, the District Court learned that defendants' expert was relying on the books and records of the defendant companies without first having independently *audited* them. On that basis, the District Court excluded defendants' expert witness from testifying. (Aplt. App. Vol. 13, p. 3331-35).

Defendants' expert was prepared to testify that defendants' "cost of goods sold" resulted in a profit margin ranging from 11% to 31.9%. (Aplt.App. Vol. 12, p. 3058) Even assuming a profit margin much higher than what Mr. Demuth calculated, for example, 50%, plaintiff would have only been entitled to damages of one half of

the $90,133,496 of revenues, or $45,066,748. But no such defense was permitted to be shown – a simple arithmetical calculation. As a result, the jury awarded the prayer of $90,133,496, unaware that a "cost of goods" offset existed, or that defendants had an expert prepared to present its calculation, using the same financial records relied upon by plaintiff's expert.

Plaintiff's case lasted approximately two weeks. Defendants had one live witness, and a minor witness at that. There was nothing for a defense witness to testify about.

**The District Court exercised personal jurisdiction over 3 foreign corporations, and one individual, none of whom had minimum contacts with the state of Oklahoma or the United States.**

Defendants, Abitron Germany, Abitron Austria, ABI Holding and Albert Fuchs did not have minimum contacts with the forum sufficient to support personal jurisdiction.

## Summary of the Argument

1. The Lanham Act enforces trademark law rights that are fundamentally "geographical." The Courts of Appeal have consistently interpreted the Lanham Act to not permit U.S. Courts to enjoin purely foreign sales that do not affect U.S. Commerce.

   Here, 5 of the 6 defendants have *zero* sales to U.S. customers, and the remaining defendant (Abitron Germany) has one sale of one RRC, plus some

spare parts, in 2016, about four years ago. The Lanham Act has never been interpreted to permit a "world-wide injunction" such as was issued below, particularly when there has been either <u>*no*</u> effect on U.S. Commerce, or the palest of a *de minimus* effect on U.S. Commerce four years prior to issuance of the world-wide injunction.

Further, the worldwide injunction lacks the specificity required by FRCP 65. Thus, the injunction enjoins use of "distinctive trade dress" and "designs" without adequately describing the trade dress.

2. The Lanham Act has never been interpreted to permit an award of Lanham Act damages on sales that take place purely outside the U.S. -- sales made by foreign-citizens (such as these defendants), in a foreign country, to foreign-citizen customers. Those are the <u>*only*</u> type of sales made by 5 of these defendants. The award of $29,583,486 of Lanham Act damages against the 5 defendants with <u>*no*</u> U.S. sales is not supported by Lanham Act case law. On similar grounds, while the Lanham Act might have permitted a limited award of damages based on the $16,670 of sales made by the one remaining defendant (Abitron Germany), those $16,670 of U.S. sales cannot support the award of $60,543,676 of damages on Abitron Germany's $60,543,676 of sales in foreign countries to foreign-citizen customers. Such sales do not have a "substantial effect" on U.S. commerce, as required by Lanham Act case law.

3. Defendants had a right to present their evidence that their sales activities did not have the requisite "substantial effect" on U.S. commerce, but the District Court erred when it excluded this evidence on grounds of "relevance" and "unfair prejudice" – after accepting plaintiff's evidence on this same issue.

4. The doctrine of "issue preclusion," by definition, applies to "issues decided" in a prior action, not non-binding *dicta* uttered in a prior action. Moreover, "issue preclusion" cannot apply to entities who were not parties to the prior proceeding, nor can it apply to the ownership of product names (and trade dress) that are *not mentioned* in the prior proceeding. The District Court erred in its application of "issue preclusion" to the "ownership" (ownership was not decided by EUIPO) of the NOVA name (the only Product mentioned in the EUIPO Order) and erred in, "expanding" the "issue preclusion" to product names and trade dress not even mentioned in the EUIPO Order, and to the ownership of unmentioned trademarks in 190+ other countries in the world whose trademark laws were not considered, and where there is no record of who was the "first to use in commerce" the product name in those 190+ countries. Further, the District Court erred as a matter of foreign law relying on the European Order to establish ownership in plaintiff when the European body did not have the jurisdiction to resolve ownership in the first instance.

5. Even if the "ownership" issue is decided against a party, the evidence of "ownership" remains admissible on other issues besides "ownership." Here, the evidence of defendants' ownership of the product names and trade dress was directly relevant on the "willfulness" element of the infringement claims. The District Court erred by forbidding evidence of defendants' ownership for that purpose. The District Court further erred by forbidding evidence of defendant's ownership (or belief in ownership) for their defense that plaintiff waived and acquiesced in contractual requirements between the parties.

6. An accounting expert is entitled to rely on the books and records of the company about which he is testifying. There is no requirement that an expert first perform an audit of the company's books and records before he can opine on what the records show. The District Court erred by allowing the plaintiff's expert to use the same books and records of the defendants to arrive at his opinion on the "revenues," while excluding the entire testimony of the defendants' expert accountant on the relatively simple calculation of "cost of goods sold," because the defendants' expert had not audited the same books and records that plaintiff's expert had relied upon.

## <u>Argument and Authorities</u>

**1. The District Court erred by granting a "world-wide" injunction under the Lanham Act against foreign citizen defendants' sales in foreign countries to foreign-citizen customers. No power to enter such an injunction exists under the Lanham Act.**

**A. Trademark and trade dress rights are fundamentally geographical.**

The District Court erred in exercising of extraterritorial subject matter jurisdiction under the Lanham Act. This error resulted in the worldwide injunction.

The standard of review of the District Court's decision on subject matter jurisdiction is *de novo*. *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995) The District Court's factual findings on jurisdictional facts are reviewed for clear error. *Id.* Defendants respectfully state that the District Court's injunction includes no such factual findings. (Aplt. App. Vol. 10, p. 2522-30.)

The Trademarks are not created by the Lanham Act or other federal law; rather, they are ancient common law creations:

> "'Federal law does not create trademarks.' *B & B Hardware, supra*, at ___ 135 S.Ct., at 1299. Trademarks and their precursors have ancient origins, and trademarks were protected at common law and in equity at the time of the founding of our country." *Matal v. Tam*, 137 S.Ct. 1744, 1751; 198 L.Ed. 366 (2017).

The priority of a trademark is not determined by who is first to register the mark, but rather by who is the first to use it in commerce. The primary authority for this is found in the Lanham Act itself. The Act specifies that, in a "race" between the first-to-use the mark, and the first-to-register the mark, the person who was "first-to-use" the mark wins.

"The cases are legion to the effect that for inherently distinctive marks, ownership

is governed by priority of use. For such marks, the first to use a designation as a mark in the sale of goods or services is the 'owner' and the 'senior user.'" J. Thomas McCarthy, *McCarthy on Trademarks*, § 19:1.25 (5th ed. 2017) .

This is also reflected in an opinion by the U.S. Court of Appeals for the Second Circuit:

"A technical trademark, consisting of a coined or fanciful expression, comes into being as soon as it is affixed, and the goods are sold. . . Priority of user alone is controlling." *Blisscraft of Hollywood v. United Plastics Co.*, 294 F.2d 694 (2nd Cir. 1972).

Of the 10 product names at issue ("NOVA," "ERGO," etc.), Hetronic International only registered one (the "NOVA") in the United States. (Aplt. App. Vol. 13, p. 3085). Hetronic International's rights under U.S. law to have a trademark in the various trade names rests entirely on a claim of an "unregistered, common law trademark."

And the establishment of a common law trademark in one geographical region, by "first use" there, does not give a person any rights in other geographical regions, where the person has not used the common law trademark yet. As one court has explained:

"At common law, trademark ownership is acquired by actual use of the mark in commerce. *Id.* However, the owner of common law trademark rights in an unregistered mark is only entitled to injunctive relief in those localities in which it has established actual use of the mark. *Id.* at 269. This is to "ensure that a trademark does not precede its owner into markets that [the owner's] trade has never reached." *Id.* (internal quotations omitted). *Schreiber v. Dunabin*, 938 F.Supp.2d 587, 598 (E.D. Va. 2013), *quoting, Emergency One, Inc. v. Am Fire Eagle Engine Co.*, 332 F.3d 267 (4th Cir. 2003).

Moreover, in many instances, not even the registration of a trademark in a

market – without first establishing sales there – will prevail over another party's "prior use" of the trademark in that geographical area. As the Court of Appeals for the Eleventh Circuit explained:

> "While we have created a national system to register marks, common-law rights are not overridden by that registration system." *Commodores Entertainment Corporation v. McClary*, 879 F.3d 1114, 1131(11th Cir. 2018).

This bedrock principle is recognized by the Supreme Court; the trademark can arise under state common law and be enforceable under the Lanham Act even without federal registration:

> "Without federal registration, a valid trademark may still be used in commerce. See 3 McCarthy § 19:8. And an unregistered trademark can be enforced against would-be infringers in several ways. Most important, even if a trademark is not federally registered, it may still be enforceable under § 43(a) of the Lanham Act, which creates a federal cause of action for trademark infringement." *Matal v. Tam*, 198 L.Ed.2d 366, 137 S.Ct. 1744 (2017).

This is true because, fundamentally, a trademark is an ancient, geographical common law right, arising only in markets where a company established the mark.

### B. Trademark law does not travel beyond a country's borders, subject to limited exceptions.

A trademark in one country generally has no enforceability in another country. Trademark law begins and ends at borders. As the Court of Appeals for the Federal Circuit explained:

> "In the present case, appellant Person's Co. relies on its use of the mark in Japan in an attempt to support its claim for priority in the United States. Such foreign use has no effect on U.S. commerce and cannot form the basis for a holding that appellant has priority here. The concept of territoriality is basic to trademark law;

trademark rights exist in each country solely according to that country's statutory scheme. Christman was the first to use the mark in United States commerce and the first to obtain a federal registration thereon. Appellant [Person's Co.] has no basis upon which to claim priority and is the junior user under these facts." *Person's Co., Ltd. v. Christman,* 900 F.2d 1565, 1569 (Fed. Cir. 1990).

The guiding principle in trademark ownership disputes is always who was the first to use the mark in commerce *in the geographical area for which trademark rights are asserted* because that is what creates the trademark in the first place. As the Court for the Federal Circuit held in *Person's Co., Ltd, supra*:

"In the present case, appellant failed to secure protection for its mark through use in U.S. commerce; therefore, no established business or product line was in place from which trademark rights could arise. Christman was the first to use the mark in U.S. commerce. This first use was not tainted with bad faith by Christman's mere knowledge of appellant's prior foreign use, so the Board's conclusion on the issue of priority was correct." *Person's Co., Ltd. v. Christman,* 900 F.2d 1565, 1571-72 (Fed. Cir. 1990).

As the Court for the Federal Circuit explained in *Person's Company, Ltd*, a plaintiff cannot secure trademark protection in markets for which it had not proven it had "established business or product line was in place from which trademark rights could arise." *Person's Co., Ltd. v. Christman,* 900 F.2d 1565, 1571-72 (Fed. Cir. 1990).

The District Court simply allowed plaintiff, in the words of the Fourth Circuit Court Appeals in *Schreiber*, to claim a trademark that "precede[d] its owner into markets that [the owner's] trade has never reached." *Id.* (internal quotations omitted). *Schreiber*, 938 F.Supp.2d at 598.

The Court of Appeals for the Second Circuit addressed the issue of the scope of an extra-territorial injunction in *Sterling Drug, Incorporated v. Bayer AG*, 13 F.3d 733 (2nd Cir. 1994), and reversed the extraterritorial injunction, stating a "more modest goal" was appropriate, one that "seeks to enjoin only those uses of the "Bayer" mark abroad that are likely to make their way to American consumers."

*Sterling Drug, Incorporated,* 13 F.3d at 746.

Other U.S. Circuit Courts of Appeal have similarly refused to allow the Lanham Act to regulate foreign commerce. *See, e.g., Star-Kist Foods, Inc. v. P.J. Rhodes & Co.*, 769 F.3d 1393, 1396 (9th Cir. 1985)("We conclude the district court acted in accordance with principles of international comity and fairness in excluding wholly foreign commerce from the Lanham Act case before it."); *Pinkberry v. JEC International Corp.* 2011 WL 610828 (C.D. Ca. Dec. 7, 2011)("Because Plaintiffs seek to enjoin Defendants' use of Japanese trademark in Japan, there is great potential for conflict with pending trademark proceedings in Japan.")

**C. The "worldwide" injunction cannot be entered because it is trying to reach sales that have no "substantial effect" on U.S. commerce.**

The "worldwide" injunction entered by the District Court violates the principles explained in the above-cited cases. First, there is no "substantial effect" on U.S. commerce by $29,483,486 of purely foreign sales by defendants Hydronic Steuersysteme, Hetronic Germany and Abitron Austria. Those defendants did not have one single U.S. sale. Under *Sterling Drug,* and under *Schreiber*, no injunction can enter in these foreign territories against these foreign defendants over their sales to foreign customers. Secondly, the "ownership" of the trade names and trade dress is geographically specific to each foreign country. Proof of ownership of a

trademark is a part of plaintiff's burden of proof *Radil v. Sanborn Western Camps, Inc.* 384 F.2d 1220 (10th Cir. 2004), but plaintiff Hetronic International has never shown that it was the first to sell in any of the other countries of the world, must less in all the other countries in the world, which is the scope of the Injunction. Therefore, the District Court cannot possibly enjoin defendants' sales in all those countries.

This equally applies to defendant Abitron Germany whose $60,560,346 of total sales over the many years in question, include only $16,670 of sales – one RRC plus some spare parts – into the United States. And, these *de minimus* sales occurred 4 years ago. Stale, foreign sales cannot possibly sustain a "worldwide" injunction.

Nor did Plaintiff present evidence of confusion in the United States sufficient to establish a substantial effect on commerce. Plaintiff's key witness on confusion, Mr. Sepp Scheuer, is a German citizen who works for plaintiff's affiliate in Germany, and he began his testimony discussing confusion that occurred in Europe. This is discussed further below. *See infra,* Section 3.

**D. The Worldwide Injunction Lacks the Specificity Required by FRCP 65**.

Further, the worldwide injunction lacks the specificity required by FRCP 65. The District Court's error in this regard is reviewed for abuse of discretion. *Sw. Stainless, LP v. Sappington*, 582 F.3d 1176, 1191 (10th Cir. 2009).

The worldwide injunction enjoins use of "distinctive trade dress" including the "black and yellow color scheme and design of housings." (Aplt. App. Vol. 10, p. 2515). The injunction does not meet the specificity requirements of FRCP 65. The injunction contains legal conclusions, but fails to give adequate notice of what is prohibited. *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 984–85 (11th Cir. 1983)(and injuction should not contain legal conclusions; an "injunction which merely forbids a defendant from …"infringing on plaintiff's trademarks" adds nothing to what the law already requires")(*citing* 2 J.T. McCarthy, *supra,* § 30.8, at 334); *Am. Greetings Corp. v. Dan-Dee Imports, Inc.,* 807 F.2d 1136, 1147 (3d Cir. 1986)(noting that the injunction did not adequately describe the trade dress leaving one to "guess" at what might violate it).

Proof that the injunction lacks specificity already exists. Below, plaintiff filed a "show cause" motion against a third-party customer of defendants (Herrenknecht USA) for violating the injunction. Herrenknecht responded, stating: "Because Herrenknecht USA was not a party of the litigation, it is unclear about the scope of the trade dress that the injunction is intended to prohibit. (Aplt. App. Vol. 10, p. 2542). Nor can this problem be fixed. An enforceable injunction under FRCP must state, with specificity, the non-functional elements of the trade dress. There were 10 products below, each with their own trade dress. Plaintiff offered no proof

of the non-functional elements of any of the following products: "EURO," "FE," "GL," "GR," "TG," "HH," "MINI," "Pocket" and "RX".

**2. The award of $90,133,496 of Lanham Act damages is unsupported because these are purely foreign sales, with no "substantial effect" on U.S. Commerce.**

The District Court erred in its exercise of extraterritorial subject matter jurisdiction under the Lanham Act. This error resulted in a judgment of $90,133,496 of Lanham Act damages on foreign sales. The standard of review of the District Court's decision on subject matter jurisdiction is *de novo*. *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995)

The U.S. Supreme Court, and several of the Circuit Courts of Appeal have recognized certain exceptions in which the Lanham Act can apply to foreign citizens. None of them apply here to support an injunction barring foreign citizens from making <u>future</u> sales in foreign countries to non-U.S. citizens.

The fundamental purpose of the Lanham Act is to protect *U.S. consumers* from confusion about the source of goods. *Atlantic Richfield Company v. ARCO Globus International Company*, 150 F.3d 189, 193 (2nd Cir. 1990)("The ultimate purpose of the Lanham Act pertinent to this appeal is to encourage domestic sellers to develop trademarks to assist domestic buyers in their purchasing decisions."). Consequently, it is axiomatic that it applies to all sellers of goods in the U.S. markets, whether those sellers are U.S. citizens or foreign citizens. *McBee v. Delica Co.,*

*Ltd*, 417 F.3d 107, 111 (1st Cir. 2005)("Further, when the Lanham Act plaintiff seeks to enjoin sales in the United States, there is no question of extraterritorial application; the court has subject matter jurisdiction.").

Here, of $90,133,496 of sales, only $16,670 were made to U.S. citizens. The remaining sales were made by foreign-citizen defendants, in foreign countries, to foreign-citizen customers. The Lanham Act has no application to those foreign sales.

Various U.S. Circuit Courts of Appeal have looked at similar issues and have found that the Lanham Act does not reach foreign sales activities. The U.S. Court of Appeals for the Second Circuit considered the application of the Lanham Act to a foreign citizen in *Vanity Fair, Inc. v. T. Eaton Co.,* 234 F.2d 633 (2nd Cir. 1956). There, the court considered a Canadian citizen defendant who had sales that infringed the plaintiff's Lanham Act trademark, with some of the sales occurring in the United States, while others occurred in Canada.

The Court for the Second Circuit began by recognizing the profoundly geographical foundation of trademark law:

> ". . . when trade-mark rights within the United States are being litigated in an American court, the decisions of foreign courts concerning the respective trade-mark rights of the parties are irrelevant and inadmissible. [citation omitted]. Similarly, the rights and liabilities of United States citizens who compete with foreign nationals in their home countries are ordinarily to be determined by the appropriate foreign law." *Vanity Fair, Inc., supra,* 234 F.2d at 639.

Nevertheless, the Court recognized that exceptions could exist. As the Court for the Second Circuit explained, while Congress has no power to regulate foreign commerce, it can regulate commerce, wherever it might occur, if that commerce has a "substantial effect on U.S. commerce." The court stated:

"While Congress has no power to regulate commerce in the Dominion of Canada, it does have power to regulate commerce 'with foreign Nations, and among the several States.' Const. art. 1, § 8, cl. 3. This power is now generally interpreted to extend to all commerce, even intrastate and entirely foreign commerce, which has a **substantial effect** on commerce between the states or between the United States and foreign countries." *Vanity Fair, Inc., supra*, 234 F.2d at 643 (Emphasis supplied).

The Court for the Second Circuit held the Lanham Act applied to the sales of this foreign citizen defendant into the U.S., but not to its sales in Canada. In so doing, the Court for the Second Circuit stated the following:

"We do not think that the Bulova case lends support to plaintiff; to the contrary, we think that the rationale of the Court was so thoroughly based on the power of the United States to govern 'the conduct of its own citizens upon the high seas or even in foreign countries when the rights of other nations or their nationals are not infringed,' that the absence of one of the above factors might well be determinative and that the absence of both is certainly fatal." *Vanity Fair Mills, Inc.,* 234 F.2d at 642-43.

Because the defendant in *Vanity Fair* was a foreign citizen who had sales in both his home country (Canada) and in the United States, the Court in *Vanity Fair* applied the Lanham Act only to the foreign defendant's sales in the U.S.:

"The district court, therefore, did not abuse its discretion in refusing to entertain claims of trade-mark infringement and unfair competition occurring in Canada. Were it not for the fact that plaintiff did not press its American claims, and they appear to be of somewhat minor significance, we think it improper to dismiss

the entire complaint, since we think that the claims of trade-mark infringement and unfair competition occurring in the United States can be clearly ascertained from the complaint." *Vanity Fair, supra*, 234 F.2d at 647.

The requirement that, before a foreign citizen defendant's activities overseas can be made subject to the Lanham Act, there must have been an effect on U.S. Commerce has been followed in each of the four U.S. Circuit Courts of Appeal to consider the issue. *Vanity Fair, Inc. v. T. Eaton Co.,* 234 F.2d 633 (2nd Cir. 1956); *McBee v. Delica Co., Ltd*, 417 F.3d 107 (1st Cir. 2005); *Tire Engineering and Distribution LLC v. Shandong Linglong Rubber Company Ltd*, 682 F.3d 292, 310-11 (4th Cir. 2012); *Wells Fargo & Co. v. Wells Fargo Express, Co.*. 556 F.2d 406 (9th Cir. 1977). No Circuit Court has rejected this rule.

The source of the District Court's error seems to be the misapplication of the "diversion of sales" doctrine to a foreign defendant.

The "diversion of sales" rule has no application to a foreign defendant operating overseas.

Simply put, when the defendant is a U.S. citizen, selling overseas to foreign customers, and the sales do not come back to the United States, our courts can still exercise jurisdiction over the U.S. citizen defendant's foreign sales if they are "diverting sales" from another U.S. citizen in violation of that U.S. citizen's trademark rights in the U.S. Thus, the power to regulate in these cases is strongly founded on the defendant's U.S. citizenship.

But when the defendant (making the foreign sales in foreign countries to foreign citizen-customers) is a foreign citizen, and the revenues are not flowing back to the United States, there is no basis for the exercise of U.S. jurisdiction under the Lanham Act. Without the substantial effect on U.S. commerce, and without the power to control the activities of a U.S. citizen, there is no power over the foreign defendant's foreign sales to foreign customers, with the product used in a foreign country. Foreign courts, not U.S. courts, have jurisdiction over the sales activities of foreign citizen defendants, taking place in a foreign country.

The Court of Appeals for the Fourth Circuit addressed this question in *Tire Engineering and Distribution, LLC v. Shandong Linglong*, 682 F.2d 292 (4th Cir. 2012), and explained that the "diversion of sales" approach could not be applied to a foreign defendant:

> "Other circuits have posited that the Lanham Act's significant-effect requirement may be satisfied by extraterritorial conduct even when that conduct will not cause confusion among U.S. consumers. Under this diversion-of-sales theory, courts find a significant effect on U.S. commerce where sales to foreign consumers would jeopardize the income of an American company. *E.g., McBee,* 417 F.3d at 126. The doctrine is narrowly applied, however, because the injury in this context—harm to a U.S. business's income absent confusion among U.S. consumers—"is less tightly tied to the interests that the Lanham Act intends to protect, since there is no United States interest in protecting *[foreign] consumers.*" *Id.* Thus courts invoking the diversion-of-sales theory have required the defendants to be U.S. corporations that conducted operations—including at least some of the infringing activity—within the United States. *Ocean Garden, Inc. v. Marktrade Co.,* 953 F.2d 500, 504 (9th Cir.1991); *Am. Rice, Inc. v. Ark. Rice Growers Coop. Ass'n,* 701 F.2d 408, 414–15 (5th Cir.1983). Only in such instances is there a sufficient nexus between U.S. commerce and the infringing activity." *Tire Engineering, supra,* 682 F.2d at 310-11.

This discredited "diversion of sales" model is what plaintiff's extraterritorial application requests rests upon; here is the testimony of their President at the time:

"Q. And, Mr. Glandon, even if the product doesn't come into the United States, but remains in some other country, how is Hetronic hurt, here in the U.S.?
A. Just as I described, so it's a global system for us, but, ultimately, it all rolls back into our U.S. entities." (Aplt.App. Vol. 13, p. 3245-46).

Mr. Glandon's testimony is that these foreign citizen defendants, engaging in sales in foreign countries to foreign customers but the product sold "remains in some other country," he can still claim "lost profits" on those sales. The Courts of Appeal in *Tire Engineering* reached the opposite conclusion. *See also, Am. Rice, Inc. v. Ark. Rice Growers Coop. Ass'n,* 701 F.2d 408, 414–15 (5th Cir.1983), to the same effect.

Similarly, the Court of Appeals for the First Circuit addressed a similar issue in *McBee v. Delica Co., Ltd*, 417 F.3d 107, 111 (1st Cir. 2005), a case in which an American plaintiff sought to enjoin a Japanese company's activities in Japan:

"We conclude that the court lacked jurisdiction over McBee's claims seeking (1) an injunction in the United States barring access to Delica's Internet website, which is written in Japanese, and (2) damages for harm to McBee due to Delica's sales in Japan. McBee has made no showing that Delica's activities had a substantial effect on United States commerce."

The United States District Court for the Northern District of Illinois reached this same issue and similarly concluded that there must be some effect on U.S. commerce before the Lanham Act can be applied to a foreign defendant's activities overseas:

"Can a United States corporation maintain a Lanham Act action against a foreign corporation for alleged trademark violations that occurred entirely abroad on no more showing than that these hurt the plaintiff's ability to conduct its business and license its products worldwide? I conclude that, without an account of how to set limits on the exercise of extraterritorial jurisdiction, this would extend my jurisdiction beyond the limits that the law allows. Accordingly, I grant the defendants' motion to dismiss any claims alleging Lanham Act violations, and I grant other motions in part and deny them in part." *Alcar Group v. Corporate Performance Systems, Ltd*, 109 F.Supp.2d 948, 949 (N.D. Ill. 2000).

**3. The trial court erred by sustaining the "relevance" and "unfair prejudice" objection thereby barring defendants from proving that defense their sales activities in Europe had no "substantial effect" on U.S. commerce.**

The District Court committed two errors. First, the District Court's exercise of extraterritorial subject matter jurisdiction was improper. That decision is subject to a de novo review. *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995). Second, because of the first error, the District Court excluded otherwise relevant evidence. If only the question of the District Court's decision on evidence was at issue, the standard of review would be abuse of discretion. Coletti v. Cudd Pressure Control, 165 F.3d 767, 773 (10th Cir. 1999). Defendants respectfully contend that the *de novo* standard applies.

Defendants have always contended that the Lanham Act claims could not reach these defendants' purely foreign sales. In discovery, defendants produced its records of sales into the U.S. (approximately €202,133 of sales, or approximately $240,639), but objected to producing its records of its purely foreign sales.

Plaintiff moved to compel, taking the position that such foreign sales – over $50 million worth at the time -- were reachable because they, somehow, "affected United States commerce." (Aplt.App. Vol. 1, p. 151). Defendants objected on Lanham Act grounds, but the District Court granted the motion explaining that this would ultimately be a factual dispute suited for summary judgment:

> "The motion will be granted for the following reasons. It's really too much of a procedural stretch for me to push through the substantive issues on this discovery motion to the extent that I would have to do so to deny the motion. It really is true that the defendants' opposition to the motion would have me treat it, in effect, as either a Rule 12 motion or a Rule 56 motion or both.
>
> * * * * * *
>
> "And by the way, on Rule 56, I don't see the need for any early or expedited Rule 56 motions. I think those can come along at the appropriate time in the usual sequence."
>
> (Aplt, App., Vol. 13, p. 3221).

Accordingly, defendants filed a Motion for Summary Judgment on March 26, 2018, after the close of discovery. In that Motion for Summary Judgment, defendants set forth proof that:

- Defendants Abitron Austria and Hydronic Steuersysteme had <u>zero</u> sales to U.S. customers, (Aplt, App., Vol. 4, p. 939).

- That Hetronic Germany had only €185,463.52 of sales to U.S. customers, and Abitron Germany only had €16,670 of sales to U.S. customers. (*see* Aplt App. Vol 4, p. 939).

Defendants requested summary judgment barring damage claims on the foreign sales." (Aplt App. Vol. 4, p. 955-56).

The District Court denied defendants' request for summary judgment noting, for example, that plaintiff had placed sufficient facts in dispute:

> "The court find that plaintiff has proffered evidence, viewed in a light most favorable to plaintiff, sufficient to establish that defendants' alleged infringing conduct has had a substantial effect on commerce." (Aplt. App. Vol. 7, p. 1711).

Plainly, that did not grant summary judgment against defendants; rather, it merely denied their request for summary judgment barring the claims.

Accordingly, defendants preserved the issue in the Final Pretrial Report, stating:

> "Finally, Plaintiff has not and cannot show that the foreign activities of Defendants had a 'substantial effect' on U.S. Commerce. For example, a sale made from Austria to a Norwegian company, which is then sold (by the Norwegian company) to its end user in Iceland can have no effect on U.S. commerce." (Aplt.App. Vol. 7, p.1877).

And, then defendants proceeded to prepare for trial, expecting to be allowed to present their evidence that the purely foreign sales did not have the requisite substantial effect on U.S. commerce. Thus, the defendants submitted Jury Instructions instructing the jury on the legal requirement that the foreign sales must have a "substantial effect" on U.S. commerce; for example, defendants' Proposed Instruction No. 11:

> "The first factor you should consider in determining whether the U.S. Lanham Act should apply to the foreign activities of foreign defendants on foreign soil is

whether the actions of defendants had a 'substantial effect' on U.S. commerce. Plaintiff contends that the totality of the actions of defendants, such as defendants' marketing efforts in the U.S., substantially affected commerce in the U.S. Defendants contend that their actions, such as sales in foreign countries, did not substantially affect U.S. commerce . . ." (Aplt. App. Vol. 7, p. 1776).

Plaintiff began their presentation of evidence, and on eighth day of trial, plaintiff called Josef Scheuerer, to present their evidence that the foreign sales of defendants had a substantial effect on U.S. commerce. (*See,* J. Scheurer testimony, Aplt.App. Vol. 13, p. 3247).

Mr. Scheuerer is a German citizen who worked in Germany within the Hetronic organization in various capacities. (Aplt.App. Vol. 13, p. 3247-48). Mr. Sheuerer testified regarding his sales activities in Europe. (Aplt.App. Vol. 13, p. 3247-52).

The cross-examination began, establishing through Mr. Scheuerer that his areas of responsibility were Germany, Finland, Norward, Northern Ireland and Luxembourg, but not the United States. Mr. Scheuerer then conceded that the companies he had testified to interactions with were German companies, beginning in the same order he had discussed them during the direct (Herrenknect, AST Degan, GmbH, MTS, etc.) (Aplt.App. Vol. 13, p. 3269-72). But, counsel for plaintiff asked for a sidebar in the middle of this cross-examination:

"Q. And then you mentioned a company called Zweihoff, if I'm saying it right.
A. Yes.
Q. Without knowing, it sounds like it must be a German company –

Ms. Berman: Your honor, I request a sidebar.
The Witness: It's a German company.
The Court: Counsel will approach." (Aplt.App. Vol. 13, p. 3272-73).

At this sidebar, quoted in its entirety below, the Court announced that its denial of summary judgment foreclosed the defendants from even disputing plaintiff's evidence that the purely foreign sales had a "substantial effect" on U.S. commerce. Plaintiff had been permitted to present this evidence of an effect on U.S. commerce, but defendants would not be allowed to contest it. The technical objection of plaintiff was "relevance" and "unfair prejudice." The objection was inexplicable given that plaintiff had just elicited 47 pages of testimony about foreign sales activity and its purported effect on the U.S. commerce. The colloquy at the bench is below:

MS. BERMAN:
Your Honor, there's something in the case law where location of the confusion, there's no distinction, it's confusion. That's what the evidence is. And it seems like defendants are trying to reargue extraterritoriality, which Your Honor granted summary judgment on and said you have -- it's a subject matter jurisdiction issue, and that they're trying to back-door it through this witness and I think it's inappropriate. It's 402 and 403. Where the confusion took place is irrelevant to whether there's confusion under the Lanham Act.
THE COURT: Where are you headed with this?
MR. RUPERT: The most recent case that we read, it's a Northern District of Illinois case, does suggest that where the confusion occurs matters. I can find out the name of it for Your Honor, but I don't have it on the tip of my tongue. But she's exactly right, that is where I'm going. It was my understanding this issue was still open. If Your Honor has already ruled on it, we can perhaps at a break put that on the record and I'll stop this. I thought this was still open.
THE COURT: How much more do you have along this line?
MR. RUPERT: I can count one -- three, sir -- no, four, five -- pardon me, sir -- six, seven. I'm sorry, sir.

THE COURT: It's the defendants' position that the location of the confusion is relevant for what purpose?
MR. RUPERT: For whether or not there is a Lanham Act claim at all.
THE COURT: Well, I've -- for better or worse, I've already crossed that bridge. And there may be a Northern District of Illinois case from last week, and if so, that's really not something that I can revisit in the middle of this trial, so the objection will be sustained."
(Aplt.App. Vol. 13, p. 3272-73.)

It goes without saying that this evidence of foreign sales and foreign activities having no effect on U.S. commerce plainly meets the standard of relevance under Rule 401, and plainly is not substantially outweighed by non-existent "unfair prejudice" under Rule 403. The court seemed to accept plaintiff's counsel's incorrect assertion that the court had, somehow, granted summary judgment *against* defendants, on their own motion, on the "substantial effect on U.S. commerce issue. No such order exists. But the Court acted as if it did, shutting down defendants' cross-examination of Mr. Scheuerer, and only allowing defendants to make and Offer of Proof that there had been no confusion affecting the U.S., and that the sales to U.S. customers were only $16,670.

**4. The District Court Erroneously Ruled on the eve of trial that *as a matter of law* plaintiff, not defendant, owned the trademarks and trade dress in the case.**

**A. The European Office did not decide the issue of ownership; dicta cannot be the basis for "issue preclusion."**

The District Court's application of issue preclusion to a European administrative order was error. (Aplt. App. Vol. 10, p. 2514, Vol. 9, p. 2397).

This District Court's decision is subject to *de novo* review. Gouskos v. Griffith, 122 F. App'x 965, 967 (10th Cir. 2005).

The District Court's decision on ownership, made 5 days before trial began, was based only on *dictum* from the EUIPO decision, violating the cardinal principles of "issue preclusion" that the issue must have been "at issue" in the prior proceeding and must have been "actually decided" in the prior proceeding. *See e.g. Knight v. Mooring Capital Fund, LLC*, 749 F.3d 1180, 1186 (10th Cir. 2014)(noting that adjudicated issue was "necessary and essential" to the outcome of prior case).

The District Court not only violated that rule by applying "issue preclusion" to *dictum* from the EUIPO decision, the District Court applied "issue preclusion" to issues not mentioned in *dicta*. That is what happened when the District Court applied the EUIPO Order to products and related trade dress not at issue in EUIPO (ERGO, EURO, GL, GR, TG, Mini, Pocket, HH, RX), to parties who were not in the proceeding (all Defendants except for Abitron Germany), and to the issue of the "who established the trademark" in the other 190 countries in the world.

**5. Notwithstanding the District Court's decision on "ownership," it erred when it ruled that defendants could not present their "ownership" evidence for a different purpose, to prove the "waiver and acquiescence" defense, or to disprove the "willfulness" of the alleged infringement.**

Under the "Rule of Limited Admissibility," Rule 105, F.R.E., evidence not admissible for one purpose may be admitted for a different purpose. It is the purpose for which the evidence is offered that determines its admissibility. The District

Court ruled, erroneously, that the ownership evidence was inadmissible, based on the court's "issue preclusion" analysis. But that did not make the ownership evidence inadmissible on other issues. The primary one for which was useful was the willfulness element of the infringement claim. Nevertheless, the District Court allowed plaintiff to prove "willfulness," but barred the defendants from presenting their ownership evidence on that issue. (Aplt.App. Vol. 9, p. 2412).

Without the defense of ownership (or belief in ownership) defendants were denied their defense that plaintiff waived and acquiesced in contractual requirements between the parties. Defendants understood the District Court's ruling on the "ownership" issue, but sought clarification if the 2000 R&D Agreement (which creates ownership of the technology in defendant) could be used for a different purpose, to prove the "waiver and acquiescence" defense to the breach of contract claim. This evidence would include proof that when defendants found the R&D Agreement, they used it to confront plaintiff's President (Torsten Rempe) who was the person who signed the R&D Agreement. (Aplt.App. Vol. 12, p 2989). Defendants contended that confrontation resulted in Mr. Rempe's waiver and acquiescence of the contract provisions that provided the basis for the breach of contract claims (which resulted in the $6,442,779 breach of contract judgment). (Aplt. App. Vol. 10. p. 2486)

Without the defense of ownership (or belief in ownership) defendants were left naked to defend against the tort claims alleged against them. All of the tort claims alleged various "dishonest" behavior by defendants. For example, plaintiff alleged that defendants engaged in unfair competition, or conversion conspiracy, tortious interference, and aiding and abetting) ($5,360,832.00). Without a "good faith" defense of ownership, the jury awarded punitive damages on the tort claims ($10,721,664). Aplt. App. Vol. 10, p. 2510.

The District Court compounded these errors by instructing the jury that you "have heard evidence that defendants claimed to own the Product Marks and the Trade Dress and that they made statements to that effect to plaintiff." Aplt. App. Vol. 9, p. 2452. In fact, the District Court prohibited defendants from offering evidence of ownership. Because the District Court gave an instruction to the jury that contradicted its prior ruling, defendants moved for a mistrial. Aplt. App. Vol. 14, p. 3388-89.

**6. The District Court Erroneously excluded Defendants' expert for failing to conduct at audit.**

The District Court erred in excluding defendant's financial expert for failing to conduct an audit. Aplt. App. Vol. 13, p. 3331.

The District Court's ruling is a mixed question or law and fact. Defendants contend that the mixed question primarily involves legal principles, and thus *de novo*

review applies. *Supre v. Ricketts*, 792 F.2d 958, 961 (10th Cir. 1986)(citation omitted).

The District Court found that Mr. Demuth was a qualified expert under FRE 702 and reasonably relied upon information (such as cost information) under FRE 703. Aplt. App. Vol. 13, p. 3334. But, the Court excluded Mr. Demuth under FRE 602 because the Court found Mr. Demuth did not have *personal knowledge* of the cost information about which he testified. *Id.* Defendants believe the Court created a new standard governing expert testimony that is contrary to the federal rules of evidence and the cases interpreting them. First, the Court's requirement that Mr. Demuth have "personal knowledge" under FRE 602 was eliminated long ago. In *Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579, 592, 113 S. Ct. 2786, 2796, 125 L. Ed. 2d 469 (1993) the United States Supreme Court explicitly rejected the notion that an expert must have "personal knowledge":

"That these requirements are embodied in Rule 702 is not surprising. Unlike an ordinary witness, see Rule 701, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation. See Rules 702 and 703. Presumably, this relaxation of the usual requirement of firsthand knowledge—a rule which represents "a 'most pervasive manifestation' of the common law insistence upon 'the most reliable sources of information,'" Advisory Committee's Notes on Fed.Rule Evid. 602, 28 U.S.C.App., p. 755 (citation omitted)—is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline."

Further, the Tenth Circuit has held that an expert can satisfy both FRE 702 and FRE 602 based on a review of underlying financial documents: *See United*

*States v. Nacchio*, 519 F.3d 1140, 1155–56 (10th Cir. 2008), *vacated in part on reh'g en banc*, 555 F.3d 1234 (10th Cir. 2009); *see also*, *Lawlis v. Moore Iron & Steel Corp.,* No. CIV-13-823-D, 2016 WL 11261895, at *4 (W.D. Okla. Jan. 11, 2016)(noting company records and statements by company personnel are types of data reasonably relied upon).

Typically, an expert relies on the financial statements of a party—such as a profit and loss statement. The "costs of goods sold" are typically a consolidated, single entry on a profit and loss statement. Mr. Demuth went "behind" the profit and loss statement. Thus, Mr. Demuth went to the general ledger detail of defendant's costs and considered the following cost types: direct material, indirect material, direct production, and indirect production costs. In arriving at the "costs of good sold" Mr. Demuth only gave defendants a "credit" for direct material and direct production costs. As an accounting expert he could have credited defendants with certain indirect production costs (e.g. costs of operating the manufacturing plant) in arriving at a profit margin, but he did not. In fact, Mr. Demuth excluded all "indirect" costs to arrive at a conservative profit margin. Mr. Demuth made that decision in consultation with defendants' CEO, Daniela Hammerer, concerning what costs were appropriate. While Mr. Demuth went "behind" the single entry on a profit and loss statement to arrive at a profit margin, Plaintiff's expert did not. Thus, Plaintiff's expert, in creating a profit margin for Plaintiff's lost profits, looked only

at the single entry on plaintiff's consolidated financial statement. Aplt. App. Vol. 13, p. 3308-13.

The District Court's exclusion of Mr. Demuth was contrary to law and, ultimately, punitive. *See e.g., Nutramax Labs., Inc. v. Manna Pro Prod., LLC*, No. 0:16-CV-01255-JMC, 2017 WL 3276284, at *1 (D.S.C. Aug. 2, 2017)(in trademark contempt action the Court noted that not considering costs would be "punitive and inappropriate" and noting court may make estimates of costs to avoid punitive sanction).

**7. The District Court Erroneously Exercised Personal Jurisdiction over 4 Defendants.**

There was no basis to exercise personal jurisdiction over foreign defendants Abitron Germany, Abitron Austria, ABI Holding and Albert Fuchs. Aplt. App. Vol. 1, p. 119-25 and p. 141-47.

The District Court's decision is subject to *de novo* review. *Marcus Food Co. v. DiPanfilo*, 671 F.3d 1159, 1166 (10th Cir. 2011).

Defendants Hetronic Germany and Hydronic Steuersysteme signed distribution agreements with a forum selection clause naming Oklahoma as the forum. Plaintiff terminated those agreements on June 6, 2014. No other Defendant is a party to these agreements.

The distribution agreements containing the forum selection clauses are not binding on Abitron Germany or Abitron Austria—neither is a signatory. *See*

*Mobilificio San Giacomo S.P.A v. Stoffi*, No. C.A. 96-415-SLR, 1998 WL 125534, at 9 (D.Del. Jan. 29, 1998) (citing Lockwood Corp. v. Black, 501 F.Supp. 261, 263-64 (N.D.Tex. 1980) (rejecting the notion that a forum selection clause applied to conduct that occurred after the plaintiff cancelled the contract containing the forum selection clause); *Neil Bros. Ltd. v. World Wide Lines*, Inc., 425 F.Supp.2d 325, 328 (E.D.N.Y.2006) (refusing to enforce a forum selection clause in license agreement when the agreement was terminated); *see also Green Tree Servicing, LLC v. Fisher*, 162 P.3d 944, 946 (Okla.Ct.App. 2007)(holding that a dispute which arises after expiration of the contract containing an arbitration clause need not be submitted to arbitration). Further, the District Court erred in finding Abitron Germany and Abitron Austria are successors-in-interest to Hetronic Germany and Hydronic Steuersysteme, when the former excluded the liability of the distribution agreements in asset agreements. Aplt.App. Vol. 1, p. 62-68. The District Court's decision to allow Abitron Germany and Abitron Austria to be sued as "successors-in-interest" was in contravention of German law. *Id.*

Otherwise, the Abitron defendants do not have contacts in the forum (Oklahoma) supporting jurisdiction over them. Neither Abitron Germany nor Abitron Austria ever had a sale of single product in Oklahoma. Aplt.App. Vol. 1, p. 71. Abitron Germany had sales of 2 RRCs and a handful of parts in the United States (but not in Oklahoma). Abitron Austria has never made a sale into the United States.

The remaining 2 defendants (Albert Fuchs and ABI Holding) are a foreign citizen and a foreign company with no contacts supporting jurisdiction in the forum below (Oklahoma). Mr. Fuchs conducted no business in Oklahoma. Aplt.App. Vol. 1, pg. 71. Mr. Fuchs travelled to Oklahoma on 3 occasions prior to 2010, or prior to the relevant period for plaintiff's claims. *Id.* Nor did Plaintiff allege that any of its claims arose from Mr. Fuchs' limited contacts with the forum. Mr. Fuchs has no business interests in Oklahoma, and has never made a sale or purchase of any product in Oklahoma. *Id.*

ABI Holding is an Austrian company. It is the shareholder of the defendant companies. Like Mr. Fuchs, ABI Holding has no sales or purchases of products in the state of Oklahoma. *Id.*

On these facts, the exercise of jurisdiction under FRCP 4(k)(2) was improper. First, the District Court actually considered contacts with other forums (Nevada, Massachusetts) that might have been proper forums, but made no determination as to same. *Archangel Diamond Corp. Liquidating Tr. v. OAO Lukoil*, 75 F. Supp. 3d 1343, 1365 (D. Colo. 2014), *aff'd sub nom. Archangel Diamond Corp. Liquidating Tr. v. Lukoil*, 812 F.3d 799 (10th Cir. 2016). More importantly, the District Court made no findings as to how its exercise of personal jurisdiction comports with the Due Process Clause of the Fifth Amendment. Id. at 1374. (Aplt. App. Vol. 1, p. 146). Albert Fuchs is an Austrian citizen; ABI Holding an Austrian company. The

District Court undertook no analysis of the heavy burden imposed on these foreign citizens if required to litigate in Oklahoma. Defendants assert this is an error as a matter of law.

**Relief Sought**

1. Defendants seek the reversal of the Lanham Act judgments in excess of $16,670 on the grounds that the plaintiff failed to show a substantial effect on U.S. commerce, and entry of Judgment in favor of defendants on all Lanham Act claims except for the $16,670.
2. Alternatively, Defendants seeks a reversal and remand for retrial on the Lanham Act claims on the grounds that the District Court erred by excluding defendants' evidence of the absence of a substantial effect on U.S. commerce, and excluded defendants' evidence of ownership.
3. Defendants seek a reversal and remand for retrial of the breach of contract judgments and the 5 tort claims on grounds that the District Court erred by excluding defendant's evidence of "belief of ownership" and committed a mistrial by telling the jury that the court had allowed such evidence, when it did not.

**Oral Argument Requested**

Oral Argument is requested because this case involves complex questions of International Law of great significance.

**Certificate of Compliance**

The brief complies volume limitations pursuant to Fed. R. App. 32(g). Excluding the parts of the brief exempted by Fed. R. App. 32(f) this brief contains 12,941words. This brief has been prepared in proportionally spaced typeface using Times New Roman font in Microsoft Word MSO (16.0.13029.20342) 64-bit.

**Certification of Privacy Redactions**

This brief has had all privacy redactions made.

**Certificate of virus-free**

This electronic submission was scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

Respectfully submitted,

*/s/Geren T. Steiner*

Anton J. Rupert, OBA #7827
Geren T. Steiner, OBA #18845
Mack J. Morgan, III, OBA #6397
**Rupert Steiner & Morgan, PLLC**
14001 Quail Springs Parkway
Oklahoma City, OK 73134
(405) 607-1494
(405) 607-1450 (Facsimile)
tony@rsm-law.com
geren@rsm-law.com
mack@rsm-law.com
ATTORNEYS FOR DEFENDANTS

**CERTIFICATE OF SERVICE**

This is to certify that a true and correct copy of the above and foregoing was emailed this 11th day of September 2020 to:

John R. Hermes, Esquire
Sam R. Fulkerson, Esquire
Philip R. Bruce, Esquire
Andrew J. Morris, Esquire
McAFEE & TAFT
10th Floor, Two Leadership Square
211 North Robinson
Oklahoma City, OK 73102-7103
john.hermes@mcafeetaft.com
sam.fulkerson@mcafeetaft.com
philip.bruce@mcafeetaft.com
andrew.morris@mcafeetaft.com
Attorneys for Plaintiff

Debbie L. Berman, Esquire
Wade Thompson, Esquire
JENNER & BLOCK LLP
353 North Clark Street
Chicago, IL 60654-3456
DBerman@jenner.com
Wthompson@jenner.com
Attorneys for Plaintiff

*/s/Geren T. Steiner*
Geren T. Steiner